# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-01138-SCT

*WILLIAM JEFFREY KNIGHT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/02/2022 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| TRIAL COURT ATTORNEYS: | BRENT M. BRUMLEY |
| | REBECCA PRUETT DENHAM |
| | JAMES LEWIS LANE, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/20/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    William Jeffrey Knight was indicted for two counts of exploitation of a child and for one count of touching a child for lustful purposes. Following a jury trial, Knight was found guilty on all counts, and he was sentenced to ninety-five years in the custody of the Mississippi Department of Corrections. Knight was also required to register as a sex offender. Knight now petitions this Court for a new trial based on several assignments of error. Finding no error, we affirm Knight's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     In November 2019, Sarah and her two minor children, Jane and John,[1] lived with Sarah's boyfriend, Knight, who was not the biological father of either child. Sarah had begun to suspect Knight was cheating on her, so she resolved to search his cell phone for evidence of infidelity.

¶3.     Although Sarah paid for her, Knight's, and her children's phones, she needed an excuse to access Knight's since it was his personal device and was passcode protected. As Knight slept through the early hours of November 7, Sarah turned off her phone and concealed it under their bed. She then woke Knight and claimed that she needed to use his phone to locate her own and to check Facebook. Knight gave Sarah his phone and passcode, but he frantically helped Sarah search the house for her "lost" phone.

¶4.     Eventually Knight went back to sleep and Sarah began scouring his phone for evidence. During her search, she came across an unfamiliar application—Vaulty—which was protected by a passcode different from the one that unlocked the phone. Sarah researched how to break through the app's passcode protection. On YouTube, she located a video that instructed her how to do so.

¶5.     After breaking into the app, she discovered a pornographic video of her twelve-year-old daughter, Jane. The video depicted Jane inserting a sex toy into her vagina. Distraught

---

[1]Fictitious names are used for the mother and her minor children to protect their anonymity.

by her discovery, Sarah quickly and quietly woke Jane and John and took them and Knight's phone to the Petal Police Department.

¶6. Upon arrival, she was greeted by Sergeant David Courtney. Sarah displayed the video for Sergeant Courtney and gave him Knight's phone and passcode. Sergeant Courtney then contacted the detective on call that night, Sammy Ray. Detective Ray ordered Sergeant Courtney to activate the phone's airplane mode and to place the phone on a charger. Sergeant Courtney followed the orders and did not search the phone further.

¶7. When Detective Ray arrived at the station, he secured Knight's phone. Sarah told Detective Ray that she had permission to use Knight's phone and that she paid the bill for the phone. Detective Ray was aware, however, that the phone was Knight's personal device. He was also aware that Sarah had broken into Vaulty instead of accessing it with a passcode.

¶8. Sarah gave Detective Ray the phone's passcode, and once the phone was unlocked, she told Detective Ray how to break into Vaulty and view the video. Detective Ray followed Sarah's instructions, broke into Vaulty, accessed the video, and viewed it.

¶9. After viewing the video, Detective Ray interviewed Jane with Sarah's permission. In the interview, Jane levied multiple allegations of sexual abuse against Knight. Detective Ray also had Sarah write a statement detailing the events of the morning of November 7 and sign a "Consent to Search" form for her and Knight's residence.

¶10. Detective Ray contacted a judge, seeking three warrants—one for Knight's arrest, one to search Sarah's and Knight's residence, and one to search Knight's phone and laptop. To

3

all three, Detective Ray appended identical underlying facts and circumstances, which chronicled Sarah's discovery of the video, Detective Ray's viewing the video and Jane's allegations. The judge subsequently granted the three warrants.

¶11.    Detective Ray executed the search warrant for Sarah and Knight's residence on November 7. At the residence, he seized Knight's laptop computer. Subsequent forensic analysis of the laptop revealed that it lacked evidentiary value. Forensic analysis of Knight's phone, however, revealed multiple items of evidence that the State later introduced at trial.

¶12.    On October 14, 2021, a grand jury indicted Knight on three counts: child exploitation in violation of Mississippi Code Section 97-5-33(1) (Rev. 2014); child exploitation in violation of Mississippi Code Section 97-5-33(5) (Rev. 2014); and touching of a child for lustful purposes in violation of Mississippi Code Section 97-5-23(1) (Supp. 2015). Per the indictment, all three counts occurred "on or between the dates of March 1, 2019 to November 7, 2019." Jane was the minor child at issue in all three counts.

¶13.    On September 15, 2022, Knight filed a motion to suppress, seeking "the suppression and exclusion of all evidence, physical, and testimonial, obtained or derived from or through or a result of law enforcement's unlawful search of [Knight's] phone . . . ." Specifically, Knight sought to exclude "[a]ll photos, videos, and/or visual depictions of [Jane] that were discovered because of [Sarah], a third-party, granting consent to search Knight's phone" and "[a]ll messages, comments, social-media communications, metadata, and/or data from or to [Jane] that were discovered because of [Sarah], a third-party . . . granting consent to search

4

Knight's phone." He filed a second motion to suppress on September 22, 2022, based on discrepancies in the search warrants, which Knight argued demonstrated that the magistrate was not neutral and detached. A hearing on the motions was held on October 6, 2022. Ultimately, the motions to suppress were denied.

¶14. On October 11-12, 2022, the circuit court conducted a jury trial. The State called five witnesses: Sergeant Courtney, Sarah, Jane, Wayne Cantrell, a certified expert in digital forensic analysis, and Detective Ray. During direct examination of Detective Ray, the State played a portion of the video Sarah found on Knight's phone. Once the State rested, Knight renewed his motion to suppress, which was again denied. Knight was the only witness called by the defense.

¶15. The jury found Knight guilty of all three counts, and the circuit court sentenced him to forty years for count one, forty years for count two, and fifteen years for count three. Knight filed a post-trial motion for JNOV or, alternatively, for a new trial, which the circuit court denied. Knight appealed.

**ISSUES PRESENTED**

¶16. Knight raises seven issues on appeal: two by his appellate attorney and five *pro se*.

I. Whether the warrantless search of Knight's cell phone violated his Fourth Amendment rights.

II. Whether prosecutorial misconduct deprived Knight of a fair trial.

III. Whether the search warrants were valid.

IV. Whether the State knowingly presented false testimony.

V.      Whether Knight's sentences were disproportionate.

VI.     Whether Knight received ineffective assistance of counsel.

VII.    Whether the trial court committed cumulative error.

**DISCUSSION**

**I.      Whether the warrantless search of Knight's cell phone violated his
         Fourth Amendment rights.**

¶17.    Knight poses an issue of first impression to this Court: do the established exceptions to the general warrant requirement derived from the Fourth Amendment and ***Riley v. California***, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), apply to cell phones? While the United States Supreme Court has yet to weigh in on this question, many federal courts of appeal have continued to apply exceptions to the warrant requirement to modern technology, such as laptops and cell phones. *See **United States v. Maher***, 120 F.4th 297, 313 n.13 (2d Cir. 2024). Following the lead of the federal courts of appeal, we analyze the application of one exception in particular: the private search doctrine.

¶18.    "The Court applies a mixed standard of review to Fourth-Amendment claims." ***Eaddy v. State***, 63 So. 3d 1209, 1212 (Miss. 2011) (citing ***Dies v. State***, 926 So. 2d 910, 017 (Miss. 2006)). "Whether probable cause or reasonable suspicion exists is subject to a de novo review." *Id.* (citing ***Dies***, 926 So. 2d at 917). But, "[i]n reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence." ***Moore v. State***, 933 So. 2d 910, 914 (Miss. 2006) (citing ***Price v. State***, 752 So. 2d 1070, 1073 (Miss. Ct. App. 1999)).

"Where supported by substantial credible evidence, this Court shall not disturb those findings." *Id.* (citing *Ray v. State*, 503 So. 2d 222, 223-24 (Miss. 1986)).

¶19. "Both the Fourth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment of the United States Constitution, and article 3, section 23, of the Mississippi Constitution protect persons from unreasonable searches and seizures." *Fisher v. State*, 354 So. 3d 284, 291 (Miss. 2022) (citing *Cooper v. State*, 145 So. 3d 1164, 1168 (Miss. 2014)). Absent an exception to the warrant requirement, "the state and federal constitutions prohibit warrantless searches[.]" *Eaddy*, 63 So. 3d at 1213 (citing *Gonzales v. State*, 963 So. 2d 1138, 1142 (Miss. 2007))."Unless the State proves that a warrantless search comes within an exception, all evidence seized from the search is inadmissible." *Id.* (citing *Jackson v. State*, 418 So. 2d 827, 829 (Miss. 1982)). In the trial court, the State argued that both the third-party consent exception and the private search doctrine applied to the warrantless search of Knight's cell phone. Because we find that the private search doctrine allows the search, we will not address third-party consent.

¶20. The United States Supreme Court first considered the warrantless search of a cell phone in *Riley*. Recognizing the unique properties of cell phones,[2] the Court held that a the government was prohibited from the warrantless search of cell phones incident to arrest.

---

[2]"The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calenders, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley*, 573 U.S. at 393.

7

*Riley*, 573 U.S. at 401. The Court did, however, leave open the possibility that other exceptions to the warrant requirement may apply to cell phones, stating that "even though the search incident to arrest exception does not apply . . . , other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401-02. Since *Riley*, a number of federal courts of appeal "have issued published opinions applying [the private search doctrine] to warrantless searches of electronically stored digital information." *Maher*, 120 F.4th at 313. With this foundation in mind, we turn to the application of the private search doctrine.

¶21.    The United States Supreme Court established the private search doctrine in *United States v. Jacobsen*, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).

> In *Jacobsen*, FedEx employees opened an accidentally damaged package to examine its contents pursuant to a company policy regarding insurance claims. They found a suspicious white powdery substance inside, put the substance back into the container (but did not re-seal it), and summoned DEA agents. DEA agents came, took the substance out of the box again, and removed a trace of it for a field test, which revealed that it was cocaine.

*United States v. D'Andrea*, 648 F.3d 1, 7 (1st Cir. 2011) (citations omitted). On appeal, the Court was faced with whether the DEA agents' actions—reopening the box and taking out the substance for testing—violated the Fourth Amendment. *Jacobsen*, 466 U.S. at 114-15. Analyzing the warrantless search, the *Jacobsen* Court stated, "[t]he additional invasions of the respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115. The Court held that "[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit

governmental use of the now-nonprivate information[.]" *Id.* at 117. The Court emphasized the Fourth Amendment's protection from unreasonable searches and seizures applied to *governmental* action, and not the actions of a private citizen who is not working as an agent of the government, or at the government's behest. *Id.* at 113. Because the DEA agents did not exceed the scope of the search first conducted by the FedEx employees, the Court held that the "agents did not infringe any constitutionally protected privacy interest that had not already been frustrated as a result of private conduct." *Id.* at 126

¶22.　Thus, the Court laid the foundation for the private search doctrine, providing that the government does not conduct a search that implicates the protections of the Fourth Amendment when (1) a private individual—not acting as the government's agent—first conducts the search or seizure, and (2) the government does not thereafter exceed the scope of the private citizen's initial search or seizure. *Id.* at 117-119.[3]

---

[3]A number of jurisdictions derive a third requirement for the private search doctrine to apply from language in *Jacobsen*. *See, e.g.*, *United States v. Lichtenberger*, 786 F.3d 478, 488 (6th Cir. 2015); *United States v. Ackerman*, 831 F.3d 1292, 1305 (10th Cir. 2016); *United States v. Wilson*, 13 F.4th 961, 973 (9th Cir. 2021). In *Jacobsen*, the Court remarked that

> [e]ven if the white powder was not itself in "plain view" because it was still enclosed in so many containers and covered with papers, there was a *virtual certainty* that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell [the federal agent] anything more than he already had been told.

*Jacobsen*, 466 U.S. at 118-19 (emphasis added). This statement forms the basis for jurisdictions that find that the government must have repeated or built upon the private search with a virtual certainty that information beyond the original search would not be revealed.

¶23. The record confirms that Sarah conducted her private search free of government influence and that neither Sergeant Courtney nor Detective Ray exceeded the scope of Sarah's private search. Whether the actions Sarah took to obtain access to the phone and Vaulty were reasonable or authorized by Knight have no bearing on our analysis of the search conducted by the officers since she was not acting as an agent of the government when she searched the phone. *See **United States v. Rivera-Morales***, 961 F.3d 1, 8 (1st Cir. 2020) ("[T]he Fourth Amendment is not implicated when a private party undertakes a search or seizure, regardless of the reasonableness vel non of her conduct, unless she is acting as a government agent." (citing ***Jacobsen***, 466 U.S. at 113)). As noted in footnote three, many jurisdictions derive a third requirement from ***Jacobsen***: that the government must have repeated or built upon the private search with a virtual certainty that information beyond the original search would not be revealed. ***Id.*** at 118-19. Although it is not clear to this Court that virtual certainty on behalf of the government agent is a requirement, since this is an issue of first impression and, acknowledging the number of jurisdictions that have adopted this prong, we nevertheless address it.

¶24. Sarah brought the phone to the Petal Police Department and showed the video to Sergeant Courtney. Because Sarah showed Sergeant Courtney exactly what she had found

---

***Id.*** The ***Jacobsen*** Court, at no point, states that virtual certainty is a requirement but, rather, uses the phrase to simply and clearly express that the officers had, in fact, not exceeded the scope of the private search. While no federal circuit court case since ***Jacobsen*** has rejected the requirement of virtual certainty, there is likewise no United States Supreme Court case that embraces the requirement of virtual certainty.

and nothing more, Sergeant Courtney would be virtually certain that he would obtain no additional information from the phone's contents. Likewise, Detective Ray followed Sarah's specific instructions on how to access the phone and view the video. He did not view any content aside from the video that Sarah previously viewed nor did he attempt to access any other portion of the phone prior to receiving the search warrant. If Detective Ray followed Sarah's explicit instructions and only viewed the content that Sarah previously viewed, as the record reveals he did, then how could he be anything but virtually certain not to view content beyond what the original search revealed? He could not.

¶25.    Justice Ishee writes that Detective Ray's personal manipulation of Knight's cell phone—at the behest and following the explicit instructions of Sarah—removes the search from the realm of the private search doctrine and places it squarely within the walls of the Fourth Amendment. Diss. Op. ¶ 79. His dissent highlights the *risk of revelation* inherent in Detective Ray's search of the cell phone. Diss. Op. ¶ 77. "Neither the Supreme Court nor this court has set fixed parameters as to what constitutes 'virtual certainty' in this context. The term though, implies something less than absolute confidence." ***Rivera-Morales***, 961 F.3d at 11. "Because the officer must rely exclusively on what the private searcher has reported, he can never be absolutely sure of what he will find. Police officers, after all, are not omniscient." ***Id.*** Justice Ishee's dissent states that "[r]ather than virtual certainty, Detective Ray had only a *hope* that he would not learn more from the phone than he already knew. Whatever the lower limit of virtual certainty may be, hope does not rise to it." Diss. Op. ¶ 82.

11

On this much, we agree. Hope cannot be enough to sustain the enigmatic virtual certainty. It is not hope, however, but a virtual (if not absolute) certainty that when the officer follows the explicit instructions of a private searcher and does not exceed the initial search by any means, the officer will view no additional content. Justice Ishee's dissent posits that the private search doctrine turns on who is holding the phone when the officer views the content discovered during the private searcher's initial investigation. Diss. Op. ¶ 79. In this approach to the doctrine, Justice Ishee worries that the person holding the phone, while the private searcher stands beside and directs each step to be taken, is more likely to see private information beyond the initial search than he would if the private searcher were to hold the phone and take the necessary steps to show the officer what she found. While the *Riley* Court recognized constitutional protections for data contained on cell phones and other like devices birthed in this modern era of technology, the federal circuit courts have "[a]lmost uniformly . . . held that the private search doctrine authorizes law enforcement officers to conduct warrantless examinations of digital files that a private person has already visually examined." *Maher*, 120 F.4th at 313; *see id.* at 313 n.13.

¶26. Whether virtual certainty of not viewing any additional content outside what the original search revealed is a requirement or not, we find that it has been satisfied in this case. Therefore, we find that the private search doctrine applies and that the warrantless search of Knight's phone by Sergeant Courtney and Detective Ray was permissible.

## II. Whether prosecutorial misconduct deprived Knight of a fair trial.

¶27. Knight complains that misconduct on behalf of the prosecutor deprived him of his right to a fair trial. Knight points to the prosecutor's questioning of him during cross-examination. He states that "the prosecutor's cross-examination . . . was replete with . . . snarky, mocking commentary and few questions of substance." Defense counsel objected to the prosecutor's questioning three times throughout the cross-examination. The first objection was overruled, with the court stating that the prosecutor had wide latitude during cross. The other two times, the court directed the prosecutor to ask a question.

¶28. "Prosecutors 'are not allowed to employ tactics which are "inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury."'" *Wilson v. State*, 194 So. 3d 855, 864 (Miss. 2016) (quoting *Galloway v. State*, 122 So. 3d 614, 643 (Miss. 2013)). "While a prosecutor may strike hard blows, a prosecutor is not at liberty to strike foul ones." *Underwood v. State*, 380 So. 3d 239, 250 (Miss. 2024) (citing *Chase v. State*, 645 So. 2d 829, 855 (Miss. 1994)). "Mississippi allows wide-open cross-examination of any matter that is relevant . . . ." *Robinson v. State*, 247 So. 3d 1212, 1231 (Miss. 2018) (alteration in original) (internal quotation marks omitted) (quoting *Anthony v. State*, 108 So. 3d 394, 397 (Miss. 2013)). "Where an accused, on direct examination, seeks to exculpate himself, such testimony is subject to normal impeachment via cross-examination . . . ." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Stewart v. State*, 596 So. 2d 851, 853 (Miss. 1992)). Generally, failure to contemporaneously object results in the waiver of the issue on appeal. *Walker v. State*, 913 So. 2d 198, 238 (Miss. 2005) (quoting *Walker v. State*,

671 So. 2d 581, 597 (Miss. 1995)). "Nevertheless, the failure to object 'in extreme cases, . . . will not act as a bar to consideration.'" *Wilson*, 194 So. 3d at 865 (alteration in original) (quoting *Ross v. State*, 954 So. 2d 968, 1002 (Miss. 2007)).

¶29.    Knight makes several arguments about the prosecutor's statements regarding photo collages of Jane made by Knight, that Knight was cheating on Sarah with her own daughter and the many Snapchat exchanges between Knight and Jane. No contemporaneous objection was made at trial regarding these statements, and they are waived on appeal. *Walker*, 913 So. 2d at 238 (quoting *Walker*, 671 So. 2d at 597); *Wilson*, 194 So. 3d at 865 (quoting *Ross*, 954 So. 2d at 1001).

¶30.    Knight's first objection came during an exchange when the prosecutor was questioning Knight with regard to messages between Knight and Jane. The prosecutor asked Knight about a particular meme sent by Jane to Knight that compared the taste of female anatomy to Bud Light. Knight responded to Jane, "that's why u don't drink bud light." The questioning continued:

> Prosecutor:    And I love that you sent that. I loved that you sent that. You know why? Because you shouldn't know that a little twelve-year-old doesn't like Bud Light, but you do know because you drank with her, and that text shows that she likes vodka that you give her and not the Bud Light.
>
> Knight:    No, ma'am. I probably didn't even read that.
>
> Prosecutor:    Oh, you just responded that's why you don't like Bud Light?
>
> Knight:    I read the top part.

14

Prosecutor:   Your response literally incorporates what the message says. She sends you that message. You have no concern for her. You don't call her mom. You don't text her mom. There's no evidence that you have any concern over her wellbeing. Your response is this explains why you don't like Bud Light, right?

At this point, Knight's attorney objected to badgering, and the court overruled, stating that "[t]here is wide latitude on cross-examination."

¶31.   Knight argues that these comments made by the prosecutor "injected her personal beliefs into the presentation of her case and vilified Knight." Knight relies on ***White v. State***, 228 So. 3d 893, 905 (Miss. Ct. App. 2017) (internal quotation marks omitted) (quoting ***Lewis v. State***, 905 So. 2d 729, 736 (Miss. Ct. App. 2004), which held that "[t]he law is clear that a prosecutor should abstain from incorporating his or her personal beliefs into the presentation of his case." Notably, in ***White***, the court was concerned with the prosecutor's comments being a "blatant projection of guilt onto White[.]" ***Id.*** at 906. The same is not the case here. The prosecution is allowed wide latitude on cross-examination, as long as her tactics are not inflammatory or intended to incite the jury. ***Acevedo v. State***, 467 So. 2d 220, 226 (Miss. 1985). She did not incorporate any personal belief as to Knight's guilt but used the text exchange as evidence that tended to demonstrate an inappropriate relationship between Knight and Jane. Given the wide latitude allowed on cross-examination, this questioning did not amount to prosecutorial misconduct.

¶32.   Knight's second objection came after an exchange on cross-examination when the prosecutor was asking about messages between Jane and Knight.

15

Prosecutor: Is that when you're outside saying let me in and texting her. Let me in. And she says chill. Chill out. Leave me alone basically. She kept deleting her Snapchat because you were having access to her, and you kept escalating, which is why you needed a video on your phone, right?

Knight: No, ma'am.

Prosecutor: That Snapchat disappears; those fleeting moments. These little collages only take you so far. You needed a video that wasn't gonna go away, so you escalated on November 5 to the point where you handed your phone to this child.

At this point, defense counsel objected, stating that "there's got to be a question. Not just testifying." The court sustained the objection and directed the prosecutor to ask her question. The third and final objection made during the state's cross-examination of Knight came when the prosecutor was questioning Knight about the timeline of November 7. Defense counsel objected, saying that the prosecutor was testifying, and the court again sustained the objection and directed the prosecutor to ask a question. As both of these objections were sustained by the court, no error occurred. *See **Dorrough v. Wilkes***, 817 So. 2d 567, 576 (Miss. 2002) ("If opposing counsel does not consider the sustained objection to be adequate, then the trial court should have been requested to instruct the jury to disregard the matter, otherwise there is no error" (citing **Marks v. State**, 532 So. 2d 976, 981 (Miss. 1988); **Gen. Motors Corp. v. Pegues**, 738 So. 2d 746, 754 (Miss. Ct. App. 1998))).

¶33. Relying on **White**, 228 So. 3d at 905, Knight argues that the cumulative effect of multiple prejudicial statements made by the prosecutor require reversal and a new trial. We do not find, however, that the prosecutor's statements were so prejudicial or inflammatory

16

as to require reversal in this case. Nor do we find the case to be so extreme as to warrant consideration of statements not objected to by defense counsel. This issue is without merit.

### III. Whether the search warrants were valid.

¶34. The affidavits and the search warrants obtained by Detective Ray contained multiple scrivener's errors. Knight argues that these errors demonstrate that the judge was not a neutral and detached magistrate. He also argues that the variance between the search warrants and affidavits render the warrants void.

¶35. The affidavit for the search warrant for Knight's cell phone and laptop stated that both electronic devices were located at his residence. In fact, Knight's phone was already in police custody at the time. The affidavit also stated that the phone and laptop "were used in the death of Franklin Clark," but no person named Franklin Clark was involved in Knight's case. The search warrant for his cell phone and laptop indicated the place to be searched as the evidence room at the Petal Police Department, not Knight's residence like the affidavit stated. The search warrant for Knight's residence indicated that both his phone and laptop were at the residence when his phone was already in the custody of the Petal police. The affidavit for the search warrant of the home also had an incorrect year, reading November 7, 2018, instead of 2019. The date on the search warrant return was also incorrect, reading 2020 when it should have been 2019.

¶36. "A magistrate who fails to perform his neutral and detached function and who serves 'merely as a rubber stamp for the police' cannot validly issue a search warrant." *McCommon*

17

*v. State*, 467 So. 2d 940, 942 (Miss. 1985) (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979)). Knight argues that the judge failed to notice and correct these errors and therefore acted as a rubber stamp for the police. Generally, however, minor clerical errors are not fatal to a search warrant. *See Mitchell v. State*, 218 So. 3d 278, 283 (Miss. Ct. App. 2017) (citing *United States v. Waker*, 534 F.3d 168, 171-72 (2d Cir. 2008)). As a neutral and detached magistrate, the judge's main inquiry is whether the affidavits and underlying facts and circumstances demonstrated probable cause to grant the warrants. *See McCommon*, 467 So. 2d at 942. Whether probable cause existed is not challenged by Knight, and it is clear from the testimony at the suppression hearing that the discrepancies were adequately addressed by the trial court. Furthermore, these errors were minor and did not impact the main inquiry—whether probable cause existed. Therefore, we find that this issue lacks merit.

### IV. Whether the State knowingly presented false testimony.

¶37. Knight argues that Jane gave false testimony at trial and that the State, knowing that Jane's testimony was false, failed to correct her testimony. He argues that this resulted in a violation of his due process rights according to *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). In *Napue*, the Court held that the defendant's Fourteenth Amendment due process rights were infringed when the state knowingly elicited false testimony from a witness. *Id.* at 271. There, the prosecutor had promised the witness that he would recommend a reduction in his sentence if the witness would testify against Napue and

other defendants involved in the murder of a police officer. *Id.* at 265-66. At Napue's trial, the prosecutor asked the witness, "[h]ave I promised you that I would recommend any reduction of sentence to anybody?" *Id.* at 271. The witness responded, "[y]ou did not." *Id.* The Court noted, "[t]hat answer was false and known to be so by the prosecutor." *Id.*

¶38. "To prove [a violation of his due process rights], the defendant must first demonstrate that a prosecution witness knowingly provided false testimony." *Robinson*, 247 So. 3d at 1235 (citing *Havard v. State*, 86 So. 3d 896, 901 (Miss. 2012)). "And even if the defendant meets this burden, a new trial is required only if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.* (alterations in original) (quoting *Napue*, 360 U.S. at 271).

¶39. Knight specifically points to testimony given by Sarah that differed from some of the testimony offered by Jane. He also highlights testimony from Jane that differed from her previous interviews with Detective Ray and the Kids Hub Child Advocacy Center. Finally he identifies portions of Detective Ray's testimony regarding the accuracy of Jane's prior statements to him compared with her testimony at trial. None of these instances demonstrate that the State's witnesses intentionally lied on the stand. "[Knight] simply points out inconsistencies in the witnesses' testimonies, and '[w]hen asked to reverse on the ground of inconsistencies or contradictions in testimony, we have held this is clearly in the jury's province and refused.'" *Id.* at 1235-36 (second alteration in original) (quoting *Turner v. State*, 818 So. 2d 1181, 1185 (Miss. 2002)). We do the same here.

19

## V.     Whether Knight's sentences were disproportionate.

¶40.    Knight argues that his sentence is disproportionate to his conviction for four reasons. First, he emphasizes that he "is a first time offender, having no previous felonies or criminal offenses." Second, he cites his approximately twenty-three years in law enforcement, in which he did his duty "in service of [the] greater good[,]" and argues that "[s]uch a record and career should have been taken into consideration when the sentencing occurred." Third, he notes that "[t]he judge had other, lesser options such as running the [three] sentences concurrent[ly]." Fourth, he claims that "[a] sentence of 95 years day-for-day is worse than a life sentence" and that such a sentence "removes all hope from a man, or any drive to even be rehabilitated."

¶41.    Knight's justifications lack legal bases. "This Court has repeatedly held that '[s]entencing is within the complete discretion of the trial court and not subject to appellate review if it is within the limits prescribed by statute.'" *Rainey v. State*, 334 So. 3d 1124, 1134-35 (Miss. 2022) (alteration in original) (quoting *Nichols v. State*, 826 So. 2d 1288, 1290 (Miss. 2002)). "[A] sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute." *Id.* (internal quotation marks omitted) (quoting *Fleming v. State*, 604 So. 2d 280, 302 (Miss. 1992)). Further, "[d]etermining whether multiple sentences run concurrently or consecutively is within the trial court's discretion." *Thomas v. State*, 277 So. 3d 532, 536 (Miss. 2019).

¶42.    Turning to the statutes under which the circuit court sentenced Knight, each confirms that Knight's sentence did not exceed the statutory maximums. The circuit court sentenced Knight to forty years for count one, forty years for count two, and fifteen years for count three, with the sentences to run consecutively. Section 97-5-35 provides the penalties for violations of Sections 97-5-33(1) and (5), instructing that "[a]ny person who violates any provision of Section 97-5-33 shall be guilty of a felony and upon conviction . . . shall be imprisoned for not less than five (5) years nor more than forty (40) years." Miss. Code Ann. § 97-5-35 (Rev. 2014). Section 97-5-23(1) provides the penalties for violations of Section 97-5-23(1), instructing that any person found guilty under Section 97-5-23(1) may be sentenced to "not less that two (2) years nor more than fifteen (15) years . . . ." Miss. Code Ann. § 97-5-23(1) (Supp. 2015).

¶43.    Considering these statutory maximums, this Court should not disturb the sentence imposed by the circuit court since it did not violate the maximum penalties prescribed for the three counts. *Rainey*, 334 So. 3d at 1134-35 (quoting *Fleming*, 604 So. 2d at 302). The sentences indeed reached the limits of the statutory maximums for all three counts, but reaching the maximum does not amount to exceeding them. Further, Knight's argument that the circuit court should have chosen a "lesser option[]" in sentencing him, such as running his sentences concurrently, is without merit since, again, "[d]etermining whether multiple sentences run concurrently or consecutively is within the trial court's discretion." *Thomas*, 277 So. 3d at 536. While Knight may believe that the circuit court mistreated him by not

21

considering his history in law enforcement and his lack of a criminal record, neither compels this Court to disturb the sentence. *See Nichols*, 826 So. 2d at 1292 ("The fact that Nichols may be convicted of a felony for the first time in his life[] does not preclude a sentence for the maximum statutory limit. As this Court has recognized, sentencing is within the discretion of a trial judge." (citing *Wall v. State*, 718 So. 2d 1107, 1114 (Miss. 1998))); *see also Rainey*, 334 So. 3d at 1135 (holding that a sentence within statutory limits did not "lead to an inference of gross disproportionality" (citing *Corley v. State*, 536 So. 2d 1314, 1319 (Miss. 1988))).

¶44. This Court has previously recognized the three-factor test to determine gross disproportionality set forth by the United States Supreme Court in *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). The test applies when a defendant brings an Eighth Amendment claim regarding his or her sentence. It dictates the following factors/procedures: (1) "look to the gravity of the offense and the harshness of the penalty[,]" (2) "compare the sentences imposed on other criminals in the same jurisdiction" and (3) "compare the sentences imposed for commission of the same crime in other jurisdictions." *Solem*, 463 U.S. at 290-91.

¶45. While this Court recognizes the *Solem* test, it has also held that "[it] is the defendant's burden to present evidence as to 'each *Solem* factor in order for the court to determine whether the sentence is disproportionate.'" *Rainey*, 334 So. 3d at 1134 (quoting *Johnson v. State*, 29 So. 3d 738, 744 (Miss. 2009)). Further, "failure to address one of the *Solem* factors

22

procedurally bars the claim." *Id.* (citing *Long v. State*, 33 So. 3d 1122, 1132 (Miss. 2010)). Here, Knight makes no mention of the Eighth Amendment on appeal and does not address any of the *Solem* factors. Any such claim he may have had is therefore barred. *Id.*

## VI.     Whether Knight received ineffective assistance of counsel.

¶46.    Knight argues that he received ineffective assistance of counsel. He states that his counsel "failed to properly investigate the case or call witnesses readily available and willing to testify." "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (Miss. 2016)). "This Court will address such claims on direct appeal when '[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed.'" *Id.* (alterations in original) (quoting *Bell*, 202 So. 3d at 1242). In the case that neither of these factors is present, "the appropriate procedure is to deny relief, preserving the defendant's right to argue this issue through a petition for post-conviction relief (PCR)." *Dartez v. State*, 177 So. 3d 420, 423 (Miss. 2015) (citing *Read v. State*, 430 So. 2d 832, 837 (Miss. 1983)).

¶47.    The record before this Court lacks sufficient evidence and information to address this claim on direct appeal, and the issue is preserved for Knight's potential future PCR petitions.

## VII.     Whether the trial court committed cumulative error.

23

¶48. Knight argues that cumulative error necessitates the reversal of his convictions and sentences. The alleged errors are:

[1.] Evidence used at trial obtained without a warrant[.]

[2.] Prosecution's questioning of [Knight] am[]ounted to little more than vile opinion and personally deduced commentary designed to vilify and inflame the jury towards bias and prejudice.

[3.] Key witness—[Jane]—admitting to lies and contradictions that directly relate to the case's vital details which were not corrected or deciphered by [the] prosecution.

[4.] [Knight] was sentenced to what amounted to more than a natural life sentence, 95 mandatory years, in this non-violent first time offense. "Time greatly disproportionate to crime."

"This Court may reverse a conviction and/or sentence based upon the cumulative effect of errors that do not independently require reversal." *Keller v. State*, 138 So. 3d 817, 876-77 (Miss. 2014) (quoting *Manning v. State*, 884 So. 2d 717, 730 (Miss. 2004)). "However, where there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (Miss. 2007) (citing *Gibson v. State*, 731 So. 2d 1087, 1098 (Miss. 1998)). Having found no error, Knight's sentences and convictions are affirmed.

## CONCLUSION

¶49. Having found no error, we affirm Knight's sentences and convictions.

¶50. **AFFIRMED.**

**COLEMAN, P.J., MAXWELL, GRIFFIS AND BRANNING, JJ., CONCUR. KING, P.J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, J. RANDOLPH, C.J., NOT PARTICIPATING.**

24

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶51. I disagree with the majority's conclusion that the Fourth Amendment was not implicated when Detective Sammy Ray conducted a search of William Jeffrey Knight's cell phone. I would find that the search of Knight's phone by Detective Ray, a government agent, infringed upon Knight's constitutional rights. Even so, because the evidence viewed by Detective Ray had been first discovered by a private citizen, who then disclosed it to Sergeant David Courtney, I would find that no constitutional harm resulted and exclusion of the evidence is not required.

¶52. Advancing technology and its effect on the Fourth Amendment are at play here. "The 'basic purpose of [the Fourth] Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" *Carpenter v. United States*, 585 U.S. 296, 303, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) (quoting *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* at 304 (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979)).

¶53. Establishing that individual privacy and security are the cardinal concerns for Fourth Amendment protection, enter modern day technology. As the United States Supreme Court

25

has acknowledged, "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Riley v. California*, 573 U.S. 373, 395, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) (citing *Ontario v. Quon*, 560 U.S. 746, 760, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010)). The Supreme Court wrote in 2014 that it "expect[ed] that the gulf between physical practicability and digital capacity [would] only continue to widen in the future." *Id.* at 394. At that time the Supreme Court noted that the "current top-selling smart phone has a standard capacity of 16 gigabytes (and is available with up to 64 gigabytes). Sixteen gigabytes translates to millions of pages of text, thousands of pictures, or hundreds of videos." *Id.* (citing Orin S. Kerr, *Foreward: Accounting for Technological Change*, 36 Harv. J.L. & Pub. Pol'y 403, 404-05 (2013)). Fast forward ten years, and one of today's top selling cell phones has 128 gigabytes of storage and is available with up to 512 gigabytes. Apple, iPhone 15, https://www.apple.com/shop/buy-iphone/iphone-15 (last visited Nov. 25, 2024). Therefore, the ever-expanding world of technology and the torrent of personal and private information accessible in a cell phone require this Court to proceed with the utmost care to continue to protect the privacy and security of individuals from government intrusion.

¶54.  In this case, Sarah suspected her boyfriend, Knight, of cheating on her. One night, after Knight had fallen asleep, Sarah thought of a ploy to gain access to Knight's phone. She then proceeded to hide her own phone. Sarah woke Knight, told him that she had lost her

26

phone, and asked for the passcode to his phone so she could look at Facebook. Knight gave Sarah the password under those false pretenses and eventually fell back to sleep. While searching through Knight's phone for evidence of his potential unfaithfulness, Sarah discovered an unfamiliar app called Vaulty. The Vaulty app, however, was also passcode protected. Sarah looked up on YouTube how to access the app sans password, and she was successful. She broke into the app, and in the passcode-protected app, Sarah discovered sexually explicit images and videos of her twelve-year-old daughter.

¶55.    Sarah immediately took Knight's phone to the police station. There, Sarah informed Sergeant Courtney that the phone was Knight's and described what she had discovered. Sarah showed Sergeant Courtney the images and videos she had viewed on Knight's phone. Afterward, Sarah gave Knight's phone to Sergeant Courtney and provided him the passcode. Sergeant Courtney then contacted Detective Ray, who instructed Sergeant Courtney to take possession of the phone and put it into airplane mode.

¶56.    When Detective Ray arrived at the police station, Sarah explained to him how she had gained access to Knight's phone. Sarah then advised Detective Ray how to get into Knight's phone. Detective Ray unlocked Knight's phone, navigated to the Vaulty app, unlocked the Vaulty app, and viewed the photos and videos that had prompted her concerns. It is from this intrusion that I find the Fourth Amendment was violated.

¶57.    It is well-settled that Fourth Amendment protection "proscrib[es] only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected

27

by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" ***United States v. Jacobsen***, 466 U.S. 109, 113-14, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) (quoting ***Walter v. United States***, 447 U.S. 649, 662, 100 S. Ct. 2395, 2404, 65 L. Ed. 2d 410 (1980)). Therefore, because the government was in no way involved, Sarah's initial search of Knight's phone did not violate the Fourth Amendment. Two further intrusions into Knight's privacy occurred by government agents, however: the first when Sarah showed the videos and pictures to Sergeant Courtney and the second when Detective Ray viewed the videos.

¶58.    The evidence indicates that when Sarah arrived at the police department, she showed Sergeant Courtney the images and videos that she had viewed on Knight's phone. "The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." ***Jacobsen***, 466 U.S. at 115. Because Sarah controlled the phone and merely showed Sergeant Courtney the videos and photos that she had previously viewed, I would find that this was an invasion into Knight's privacy but that it did not violate the Fourth Amendment.

¶59.    That leaves Detective Ray's viewing of the same videos and photos. In Detective Ray's case, he unlocked Knight's phone using the passcode given to him by Sarah. He then proceeded to enter the second passcode into the Vaulty app and unlock it. I would find that this intrusion into Knight's privacy violated the Fourth Amendment. The facts are clear that Knight gave Sarah the passcode to his phone under false pretenses. It is equally clear that

Knight did not give Sarah the passcode to the Vaulty app and that Sarah did not have authorization to open the Vaulty app. She researched online how to break into the app and did so accordingly. Moreover, Detective Ray knew the circumstances of Sarah initial search and that Sarah did not have authorization to open the Vaulty app. Yet he proceeded to break into the app himself. Because of the almost limitless amount of information that can be gleaned from a cell phone, an individual's expectation of privacy in his own cell phone is of the highest order. With that in mind, I would find that Knight's expectation of privacy remained intact and was not frustrated by Sarah's actions. Therefore, Detective Ray's warrantless opening of Knight's locked phone and his subsequent opening of the locked app contained in Knight's phone was a violation of the Fourth Amendment.

¶60.    Nonetheless, because no evidence suggests that Detective Ray viewed anything but the photos and videos that Sarah had discovered and then showed to Sergeant Courtney, I would find that the subsequent violation by Detective Ray resulted in no actionable harm. "[T]he Fourth Amendment 'has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons.'" **United States v. Leon**, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (quoting **Stone v. Powell**, 428 U.S. 465, 486, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976)). And "[t]he exclusionary rule is neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.'" **Id.** at 906 (quoting **Stone**, 428 U.S. at 540 (White, J., dissenting)). Because Detective Ray's unconstitutional search of Knight's phone resulted in his viewing of

29

evidence that had previously been discovered by Sarah and disclosed by her to Sergeant Courtney, I would find that the invocation of the exclusionary rule is not necessary in this case. Therefore, I agree with the majority's decision to affirm Knight's convictions and sentences.

**ISHEE, JUSTICE, DISSENTING:**

¶61.    In these United States, the people's consent to be governed has at all times been accompanied by a resolute demand for privacy.  Even before our nation was founded, those who would become Americans resisted unfettered government access to private spaces and effects.  Soldiers for the Crown ransacked homes at random with neither cause nor warrant, and out of these invasions, the seed of the Fourth Amendment grew.  *See **Riley v. California***, 573 U.S. 373, 403, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014); ***Boyd v. United States***, 116 U.S. 616, 624-25, 6 S. Ct. 524, 29 L. Ed. 746 (1886), *overruled by **Warden, Md. Penitentiary v. Hayden***, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967).  That seed bore fruit in 1791 with the Amendment's ratification and has, by way of the warrant requirement, protected individuals from government invasions into their privacy ever since.

¶62.    The Fourth Amendment's reach—when agents of the government must obtain a warrant prior to a search or seizure—has continually been challenged, however.  In the years following 1791, advancing technology and the government's resulting ability to observe an individual's private life have repeatedly forced the United States Supreme Court to weigh

the Amendment's protections against the government's efforts to combat crime.[4] One early example of the Supreme Court's doing so came in ***Olmstead***.  There, in the heat of Prohibition, federal agents, without first obtaining warrants, installed wire taps along multiple phone lines used by alleged bootleggers and listened to their private conversations. ***Olmstead***, 277 U.S. at 456-57.  In a narrowly split decision (five-to-four), the Supreme Court held "the wire tapping . . . did not amount to a search or seizure within the meaning of the Fourth Amendment." ***Id.*** at 466.  It found dispositive that "[t]he evidence was secured by the use of the sense of hearing and that only." ***Id.*** at 464.  In a powerful dissent, however, Justice Louis Brandeis resisted condoning the government's warrantless actions and foreshadowed the potential Fourth Amendment fallout of evolving technology.  He warned:

> The progress of science in furnishing the government with means of espionage is not likely to stop with wire tapping.  Ways may some day be developed by which the government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate of occurrences of the home.

***Id.*** at 474 (Brandeis, J., dissenting).

---

[4] *See, e.g.*, ***Carpenter v. United States***, 585 U.S. 296, 138 S. Ct. 2202, 201 L. Ed. 2d 507 (2018); ***Riley***, 573 U.S. 373; ***United States v. Jones***, 565 U.S. 400, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012); ***Kyllo v. United States***, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001); ***United States v. Karo***, 468 U.S. 705, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984); ***Smith v. Maryland***, 442 U.S. 735, 99 S. Ct. 2577, 61 L Ed. 2d 220 (1979); ***Olmstead v. United States***, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), *overruled by* ***Katz v. United States***, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

¶63. Today, those ways have been developed. The way relevant to this case is of course by searching a modern cell phone, commonly referred to as a "smart phone." As the Supreme Court explained in 2014:

> Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

*Riley*, 573 U.S. at 396-97. Needless to say, given the unique concentration of private information stored on a cell phone, each case concerning the warrantless search of such a device must be undertaken with utmost care. I therefore carefully consider whether Detective Ray violated Knight's Fourth Amendment rights when he searched Knight's cell phone without a warrant, bearing in mind both the origins of the Fourth Amendment and the importance of preserving its purpose.

¶64. The Fourth Amendment to the United States Constitution; Article 3, Section 23, of the Mississippi Constitution; and this Court's precedent establish that "[u]nless the State proves that a warrantless search comes within an exception [to the warrant requirement], all evidence seized from the search is inadmissible." *Cole v. State*, 242 So. 3d 31, 38 (Miss. 2018) (first alteration in original) (internal quotation marks omitted) (quoting *Eaddy v. State*, 63 So. 3d 1209, 1213 (Miss. 2011)); U.S. Const. amend. IV; Miss. Const. art. 3, § 23. The two exceptions the State argues apply in Knight's case are the private-search doctrine and the third-party-consent exception. Although United States Supreme Court jurisprudence

32

defines these exceptions, the Court has been silent regarding their application to modern cell phones.

¶65.    The Court's seminal holding on the warrantless search of cell phones came in *Riley*. Holding that law enforcement's warrantless search of Riley's cell phone incident to his arrest violated his Fourth Amendment rights, the Supreme Court pointedly declared:

> Our holding . . . is not that the information on a cell phone is immune from search; it is instead that *a warrant is generally required before such a search*, even when a cell phone is seized incident to arrest. . . .
>
> . . . .
>
> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life[.]" [*Boyd*, 116 U.S. at 630]. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

*Riley*, 573 U.S. at 401, 403 (emphasis added).

¶66.    While *Riley* hinted that all searches of cell phones require a warrant, its holding was admittedly narrow, made in the context of a search incident to arrest and without consideration of either the private-search doctrine or the third-party-consent exception. *See, e.g.*, *United States v. Rivera-Morales*, 166 F. Supp. 3d 154, 168 (D.P.R. 2015) (holding *Riley* did "not govern" the case because the search of Rivera-Morales's cell phone "was conducted prior to [his] arrest"), *aff'd*, 961 F.3d 1 (1st Cir. 2020). The exceptions are hence in flux regarding their application to warrantless searches of cell phones. And this Court now

33

sails uncharted waters, its only waypoints the anachronistic Supreme Court decisions that established the exceptions and varying interpretations of each by federal and state courts.

¶67. Because the majority excuses Detective Ray's actions by applying the private-search doctrine, I address that exception first. The Supreme Court established the private-search doctrine in *United States v. Jacobsen*, 466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984).[5] The majority correctly recalls the facts of *Jacobsen*, yet it incorrectly gleans the requirements that the case set forth.[6] In the wake of *Jacobsen*, *three* requirements govern

---

[5] *Jacobsen* was called into doubt by *Jones*, which "explained that government conduct can constitute a Fourth Amendment search *either* when it infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space or thing ('persons, houses, papers, and effects') for the purpose of obtaining information." *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Because *Jones*'s effect on the private-search doctrine remains unclear and because *Jacobsen* has been so widely held to be the governing case in scenarios such as Knight's, I proceed with an isolated analysis of *Jacobsen*. But I am cognizant that *Jones*, at a later date, may influence this opinion, whether unlocking a passcode-protected cell phone without a warrant amounts to a trespass *vel non*.

[6] The majority claims that *Jacobsen* did not establish virtual certainty as a requirement of the private-search doctrine. Maj. Op. ¶ 22 n.3. The majority cites no case from any court that *rejects* virtual certainty as a requirement, however, as the majority does here. It instead only cites multiple cases in which courts have applied the virtual-certainty requirement and notes that no Supreme Court case has "embrace[d] the requirement" post-*Jacobsen*. Maj. Op. ¶ 22 n.3. The failure of the majority's citations to support its rejection of the virtual-certainty requirement is self-evident. As for the Supreme Court's not "embrac[ing]" the requirement, the Supreme Court has not analyzed *requirements one, two or three* in a case involving a private search and a subsequent repetition or extension of that search by law enforcement since *Jacobsen*. Maj. Op. ¶ 22 n.3. The Court has only analyzed requirement one in a different context—a case involving a question of whether breath and urine tests conducted on employees by private railroad companies pursuant to Federal Railroad Administration regulations implicated the Fourth Amendment. *See Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 614-16, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). I

34

whether the private-search doctrine applies in a given case: (1) the private searcher must have conducted his or her search free from government influence, (2) the government must not have exceeded the scope of the private search, and (3) the government must have repeated or built upon the private search with a virtual certainty that information beyond the original search would not be revealed. *Jacobsen*, 466 U.S. at 113, 126, 118-19. Because the record confirms that Sarah conducted her private search of her own volition and because the record does not confirm that Detective Ray viewed any information on the phone that Sarah had not viewed previously, I consider only requirement three.

¶68.    As a threshold matter, *Jacobsen* established with clarity how its requirements applied to physical objects—a package or a small container. But modern cell phones and computers blur that clarity and force federal and state courts to interpret the requirements anew to account for the complexities of modern information technology. *See People v. Morse*, 531 P.3d 1059, 1064 (Colo. 2023) ("In recent decades, courts around the country have wrestled with how to apply [the private-search doctrine] to searches of computers and other electronic devices, which implicate unique privacy concerns."). The task has proved difficult, inevitably due to the analog circumstances that gave rise to the requirements. Contrasting two often-cited cases, *United States v. Runyan*, 275 F.3d 449 (5th Cir. 2001), decided

---

also note that discussion of "certainty" is not absent in post-*Jacobsen* cases involving the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 416, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (Souter, J., dissenting) (discussing the fallacy of certainty that a drug dog would only uncover contraband).

thirteen years pre-*Riley*, and ***United States v. Lichtenberger***, 786 F.3d 478 (6th Cir. 2015), decided one year post-*Riley*, demonstrates two potential interpretations.

¶69.　　In ***Runyan***, following multiple private searches, law enforcement officers, without a warrant, accessed and viewed the contents of various electronic storage devices—floppy disks, CDs, and ZIP disks—that allegedly contained child pornography. 275 F.3d at 453-54. The court considered whether the private-search doctrine applied based on two facts: (1) the private searchers had accessed and viewed the contents of some, but not all, of the storage devices law enforcement later searched, and (2) law enforcement accessed and viewed additional content not viewed or accessed by the private searchers that was stored on those devices that the private searchers had searched. *Id.* at 460-65. To the first fact, the court did not apply the private-search doctrine. It held law enforcement "exceeded the scope of the private search . . . when they examined disks that the private searchers did not examine" because law enforcement "could not have concluded with *substantial certainty* that all of the disks contained child pornography based on knowledge obtained from the private searchers, information in plain view, or their own expertise." *Id.* at 464 (emphasis added). To the second fact, however, the court applied the private-search doctrine. It held law enforcement officers "do not exceed the private search when they examine more items within a closed container than did the private searchers" because "an individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers." *Id.* at 464, 465.

¶70.    In *Lichtenberger*, a law enforcement officer, without a warrant, asked a private searcher to open files on a laptop computer stored in an electronic file folder the private searcher had previously searched and had alleged contained child pornography.  Declining to apply the private-search doctrine, the court found two facts dispositive: (1) the private searcher "could not recall" if the files she opened were the same files she had opened during her prior search and (2) the officer "admitted that he may have asked [the private searcher] to open files other than those [she] had previously opened." *Lichtenberger*, 786 F.3d at 488. These facts led the court to conclude that the officer had "no virtual certainty" that his "review was limited to the photographs from [the private searcher's] earlier search[.]" *Id.* Further, "there was a very real possibility [the officer] exceeded the scope of [the prior search] and that he could have discovered something else on [the] laptop that was private, legal, and unrelated to the allegations prompting the search." *Id.* at 488-89.

¶71.    Where *Runyan* and *Lichtenberger* fundamentally differ is in their determinations of when to apply the certainty analysis. *Runyan* applied its "substantial certainty" analysis only to the devices the private searchers had not searched, thus establishing its container-based approach that excused law enforcement's searching devices the private searchers had searched only in part. *Runyan*, 275 F.3d at 464. *Lichtenberger* rejected this container-based approach, however, and applied its virtual-certainty analysis to a container the private searcher had searched in part—the file folder. *Lichtenberger*, 786 F.3d at 488.

¶72. To illustrate, if **Runyan** were strictly applied to the facts of **Lichtenberger**, the private-search doctrine would have applied to the officer's search in the latter. Under **Runyan**, the file folder in **Lichtenberger** would qualify as a container, and the officer would therefore be free to search any file in the folder simply because the private searcher had already searched some of the files within it. Alternatively, if **Lichtenberger** were strictly applied to the facts of **Runyan**, the private-search doctrine would not have applied to the officers' opening additional files on the devices the private searchers had previously searched. Under **Lichtenberger**, the officers in **Runyan** could not have been virtually certain that they would view only the files the private searchers viewed. Further, the officers' actually viewing additional files would have amounted to exceeding the scope of the private searches.

¶73. Although I concur with **Lichtenberger** and reject **Runyan**, I propose neither interpretation is sufficient to preserve the intent of the Fourth Amendment. To prime my proposal, I note five persuasive cases that resemble Knight's: **United States v. Richard**, No. 6:15-CR-00175, 2015 WL 8462500, (W.D. La. Sept. 30, 2015), *report and recommendation adopted by* No. 6:15-CR-00175, 2015 WL 8540878, (W.D. La. Dec. 9, 2015); **Rivera-Morales**, 961 F.3d 1; **United States v. Suellentrop**, 953 F.3d 1047 (1st Cir. 2020); **Morse**, 531 P.3d 1059; and **Lichtenberger**, 786 F.3d 478. One vital difference between these cases and Knight's is glaring: in each of the five cases, the private searcher accessed and displayed for law enforcement's viewing the illicit content he or she had uncovered, leaving law

enforcement to simply view the content. In none of the cases did the government agents manipulate or unlock the cell phones or the computers. *See Richard*, 2015 WL 8462500, at *5 ("Ms. Breaux showed the image to Detective Stewart by having him view her cell phone."); *Rivera-Morales*, 961 F.3d at 11 ("Sánchez pulled up exactly the same video that she had discovered at home, showed that video—and nothing else—to the officers, and accessed no other material on the defendant's cellphone."); *Suellentrop*, 953 F.3d at 1050 ("Donnelly's private search already had occurred" when Donnelly "unlock[ed] the phone and show[ed] an image to Deputy Roberts."); *Morse*, 531 P.3d at 1064 ("A.A. showed Officer Brunjes the video of Morse having sex with her while she was unresponsive."); *Lichtenberger*, 786 F.3d at 480 ("Officer Huston asked [Holmes] to show him the images. Holmes opened several folders and began clicking on random thumbnail images to show him."). Here, however, the record reveals that Detective Ray entered the requisite passcodes and accessed the phone himself.

¶74. In manipulating Knight's phone, Detective Ray entered the phone's passcode, unlocked the phone, navigated the phone to access Vaulty, opened the video in Vaulty, and viewed the video. These actions created two risks. First, when Detective Ray unlocked the phone and navigated to Vaulty, he revealed the phone's home screen and made the phone's general contents available for his viewing. At that point, Detective Ray risked uncovering Knight's private information, including any app and piece of information that was not separately passcode protected. Second, when Detective Ray accessed Vaulty, he made

39

available for his viewing Vaulty's general contents. At that point, Detective Ray risked uncovering further private information, including any photos, videos, and files other than the video that Knight had saved in Vaulty. Further, the two risks were only compounded by the fact that Detective Ray did not know what information Sarah had uncovered on the phone besides the video and that Sarah obviously had not uncovered all of the information on the phone.

¶75.   Despite these risks, both *Runyan* and *Lichtenberger*[7] suggest that the private-search doctrine should apply to Detective Ray's actions. Under *Runyan*, Vaulty, or in the extreme the phone generally, would be classified as a container, and Detective Ray would therefore be allowed to search it in full because Sarah had previously searched some of its contents. Under *Lichtenberger*, Detective Ray would be virtually certain because the record does not suggest that he accessed any files that Sarah had not. Both of these interpretations fall short of a sound reading of *Jacobsen*, however. To reemphasize, the *Jacobsen* Court held that "there was a *virtual certainty* that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell [the agent] anything more than he had already been told." *Jacobsen*, 466 U.S. at 118-19. With its interpretation of virtual certainty, *Lichtenberger* came close to correctly adapting the requirement. But I am compelled to go a step further and declare that any time an officer accesses and navigates a

---

[7] *Rann v. Atchison*, 689 F.3d 832 (7th Cir. 2012), and *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), *overruled on other grounds by United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020), held similarly to *Runyan* and *Lichtenberger*, respectively.

modern cell phone, the officer cannot be virtually certain he will not be told "anything more than he had already been told." *Jacobsen*, 466 U.S. at 118-19.

¶76.    Much like when an officer asks a private searcher to open files in a folder at random, when an officer unlocks a passcode-protected cell phone, with no assurance of what information awaits beyond the passcode prompt, he creates an extreme risk of exceeding the scope of a private search. Again, when Detective Ray unlocked Knight's phone, he exposed himself to the potential of encountering any subset of the unquantifiable cache of Knight's private information stored on the phone. Accordingly, it is impossible to say that Detective Ray had a virtual certainty he would not uncover any information beyond that uncovered by Sarah's private search. The operating systems of modern cell phones function and fluctuate even when the phone is locked. It would not be a stretch of the imagination to say that any aspect of Knight's private life could have revealed itself to Detective Ray once he unlocked the phone. Such risk simply does not evince any level of certainty, let alone virtual certainty.

¶77.    By the majority's logic, Detective Ray was virtually certain because he "followed Sarah's explicit instructions and only viewed the content that Sarah previously viewed." Maj. Op. ¶ 24. This logic is flawed in that it does not actually address whether Detective Ray was virtually certain. It instead merely repeats the facts necessary to satisfy requirement two under *Jacobsen*—that the government must not have exceeded the scope of the private search. *Jacobsen*, 466 U.S. at 126. The majority therefore ignores the virtual-certainty requirement entirely, declaring in effect that an officer is virtually certain *every time* he

41

conducts his search at the instruction of the private searcher and does not exceed the scope of the private search. But the officer is not the private searcher, and his virtual certainty is not determined by the instructions provided by the private searcher, no matter how "explicit." Maj. Op. ¶ 24. I concede that the private searcher's instructions would be paramount were this Court reviewing the search of a package or a small container. But here, the majority's heavy reliance on Sarah's instructions lends no consideration to the nature of the container being searched. Further, that the officer did not exceed the scope of the private search does not inform the virtual-certainty analysis. Whether the officer was virtually certain is not determined by what followed the commencement of the officer's search but rather by *what the officer's search risked revealing prior the search's commencement*. To be sure, what may be revealed when repeating the search of a package or a small container pales in comparison to what may be revealed when repeating the search of a cell phone.

¶78.    Nevertheless, since the majority has won the day, no scenario now exists in which this Court could find virtual certainty absent under like circumstances. Said another way, if this Court deems Detective Ray was virtually certain not to exceed the scope of a private search when he unlocked the door concealing essentially an individual's *entire* private life—the initial passcode prompt on Knight's phone—then the necessary conclusion is that an officer *is always virtually certain*. Again, Detective Ray was unlocking Knight's cell phone. He was not repeating the search of a package or a small container. Were that the case, the majority's interpretation of virtual certainty would be sustainable. Alas, we are dealing with

42

a device the contents of which far surpass those of any one physical object that can change by the millisecond, potentially exposing information from personal reminders to private emails and medical records.[8] Consequently, Detective Ray could not have been virtually certain he would not uncover information beyond Sarah's private search when he unlocked the phone. Given the amount of private information a modern cell phone contains, no warrantless search was indeed more likely to lead Detective Ray outside the scope of Sarah's private search than unlocking Knight's phone with no idea, and without question no virtual certainty, what troves of Knight's private life waited behind the phone's initial passcode prompt. Further, this likelihood was only compounded when Detective Ray accessed Vaulty with no idea if content other than what Sarah had uncovered lay within and would be visible upon accessing the app.

---

[8] In **Rivera-Morales**, Rivera-Morales raised an argument regarding the unpredictability of cellular notifications. He claimed "that the officers could not have been virtually certain that a notification—such as a calendar appointment or text message—would not pop up on the cellphone's screen while they were watching the video." 961 F.3d at 12. Rejecting this argument, the court held that "it is neither clear not obvious that the possible appearance of a pop-up notification on the defendant's cell phone was sufficient to dispel the officers' virtual certainty that they would see no other information of significance when they accessed and viewed the video." *Id.* at 14. But I note that the private searcher accessed and displayed the video for the officers' viewing. The officers did not unlock the phone, manipulate the phone, or expose themselves to the potential of encountering any of the phone's contents as Detective Ray did. The risk of encountering information beyond the private search is far greater when navigating a phone than when viewing a single video file.

43

¶79.     Because Detective Ray possessed, manipulated, and searched Knight's phone himself, instead of having Sarah access the video and display it for his viewing,[9] and because of the high chance of other personal information being accessed on the phone, I would hold that requirement three—that the government must have repeated or built upon the private search with a virtual certainty that information beyond the original search would not be revealed—is not satisfied. *Jacobsen*, 466 U.S. at 118-19.  Accordingly, I would also hold that the private-search doctrine does not shield Detective Ray.  Detective Ray did not have and could not have had virtual certainty that he would not discover information on Knight's phone that exceeded Sarah's private search.  To condone Detective Ray's conduct declares that law enforcement can seize, unlock, and search a person's passcode-protected cell phone without a warrant so long as another person who is not the phone's user knows the phone's passcode and alleges that he or she found illicit content on the phone.

¶80.     Presiding Justice King indeed makes that declaration, simultaneously admitting Detective Ray violated Knight's Fourth Amendment rights and claiming the violation

---

[9] This distinction has not been dispositive to some federal circuit courts.  For example, in *United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013), the court held that although "an officer moved and touched the laptop for 17 seconds[,] [n]o evidence suggests that the officer's viewing went further than [the private searcher's] search."  And in *United States v. Tosti*, 733 F.3d 816, 822 (9th Cir. 2013), the court held that a detective's scrolling through images a private searcher had previously viewed "was not a search because any privacy interest in those images had been extinguished."  But where I take issue with Detective Ray's manipulation of Knight's phone is in his navigating the phone prior to viewing the video.  In *Goodale* and in *Tosti*, the illicit files were already open on the computers, and the officers merely scrolled through or enlarged the files. *Goodale*, 738 F.3d at 920; *Tosti*, 733 F.3d at 819.

44

resulted in "no actionable harm." CIPR Op. ¶ 60. He reasons that Detective Ray was justified in unlocking Knight's cell phone without a warrant because he did not view any information other than what Sarah discovered. CIPR Op. ¶ 60. The terrifying implication of his reasoning is that officers can disregard an individual's privacy, unlock and navigate an individual's cell phone, and suffer no consequences if they *happen* to view the same files a private searcher viewed—in other words, a retroactive free pass for officers.

¶81. Excusing officers in this way simply does not align with the right to privacy the Fourth Amendment ensures—a right to privacy that "is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause" and that is not "revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment." *Mapp v. Ohio*, 367 U.S. 643, 660, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). Therefore, in accordance with the caution exhibited in *Riley*, and with respect for both the sanctity of each individual's personal cell phone and the instrumental role of the warrant requirement in this country, I would further hold that, in circumstances such as these, law enforcement must, quite simply, "*get a warrant*." *Riley*, 573 U.S. at 403.

¶82. To be clear, I do not mean to imply that law enforcement cannot, under any circumstances, view illicit content on a cell phone when it is accessed and displayed by a private citizen for viewing. To do so would destroy the intended purpose of the private-search doctrine. As both the majority and Presiding Justice King note, Sergeant Courtney's viewing the video Sarah displayed for him is protected by the private-search doctrine. Maj.

45

Op. ¶¶ 23, 24; CIPR Op. ¶ 58. Had the exchange between Detective Ray and Sarah been identical—Sarah unlocks and navigates the phone, accesses the video, and only then shows Detective Ray the phone's screen—I would also apply the private-search doctrine. Contrary to the majority's contention, who "hold[s]" the phone is not what worries me and oversimplifies my analysis. Maj. Op. ¶ 25. For many of the above reasons, I would likely take issue with Detective Ray asking Sarah, while she held the phone, to repeat her search and Detective Ray viewing the phone's screen as Sarah unlocked the phone and navigated to the video instead of waiting until Sarah had accessed the video to view the phone's screen. But that is not what happened and need not be addressed further. What removed Detective Ray from the protections of the private-search doctrine was his unlocking and navigating the cell phone. Those actions terminated any virtual certainty he could have had that he would view only the contents of the phone uncovered by Sarah during her private search. Rather than virtual certainty, Detective Ray had only a *hope* that he would not learn more from the phone than he already knew. Whatever the lower limit of virtual certainty may be, hope does not rise to it.

¶83. I do recognize, and gladly so, that the consequence of my proposed holding would be that agents of the government cannot ever unlock and search an individual's passcode-protected cell phone without a warrant. Today, securing a warrant presents few obstacles, and requiring the government to do so to protect individual privacy would impose little inconvenience on law enforcement. I must add, however, that Jane's being brought to the

46

police department prior to Detective Ray's search, and thus removed from Knight's presence, decidedly informs my reasoning. Because Jane was no longer in Knight's proximity and was therefore no longer in danger when Detective Ray conducted his warrantless search, the circumstances did not require Detective Ray to immediately search Knight's phone. *See generally Riley*, 573 U.S. at 387-91. And Detective Ray did not have an unavoidable need to view the contents of the phone before obtaining a warrant. Had the circumstances been different, had Jane been in danger, I would instead propose holding that Detective Ray's search was lawful due to exigent circumstances. *See Crawford v. State*, 192 So. 3d 905, 923 (Miss. 2015) (listing the requirements for a legal "emergency search" (citing *Baker v. State*, 802 So. 2d 77, 79 (Miss. 2001))).

¶84. I now turn to the State's second proposed exception: the third-party-consent exception. The majority does not address this exception because its application of the private-search doctrine eliminates a need to do so. My ultimate conclusion, however, demands I address why the exception does not apply.

¶85. In *Brown v. State*, this Court recognized that "[c]onsent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy." *Brown v. State*, 358 So. 2d 1004, 1005 (Miss. 1978) (citing *Haralson v. State*, 318 So. 2d 891 (Miss. 1975); *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)). With *Brown* as

47

my foundation, I inquire whether Sarah possessed actual or apparent authority over Knight's phone.[10] *See* **United States v. Gonzales**, 508 Fed. App'x 288, 290 (5th Cir. 2013) ("Valid consent from a third party, rather than from the person whose property was seized, requires proof that 'the third party had either actual or apparent authority to consent.'" (quoting **United States v. Gonzales**, 121 F.3d 928, 938 (5th Cir. 1997), *overruled on other grounds by* **United States v. O'Brien**, 560 U.S. 218, 130 S. Ct. 2169, 176 L. Ed. 2d 979 (2010))).

¶86.    "A third party has actual authority to consent to a search 'if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.'" **United States v. Andrus**, 483 F.3d 711, 716 (10th Cir. 2007) (quoting **United States v. Rith**, 164 F.3d 1323, 1329 (10th Cir. 1999)).  But "[e]ven where actual authority is lacking . . . a third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent." **Id.**[11]

---

[10] A variety of cases discuss authority to grant third-party consent.  *See* **Frazier v. Cupp**, 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed 2d 684 (1969) (holding joint use of a duffel bag gave one of the users "authority to consent to [the bag's] search"); **Matlock**, 415 U.S. at 171 (holding "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" could grant consent); **Crawford**, 192 So. 3d at 933 ("whether a third party can give valid consent to enter and search turns upon his or her apparent authority over a property").

[11] The United States Supreme Court established apparent authority as a justification for valid third-party consent in **Illinois v. Rodriguez**, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990).  There, the Court held:

[D]etermination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?  If not, then warrantless entry without further

48

¶87.    At this stage, I draw from the Tenth Circuit's holding in *Andrus* to classify Knight's

phone in the context of third-party consent.  There, the *Andrus* Court considered third-party

consent's application to a desktop computer in a home.  *Andrus*, 483 F.3d at 717.  In doing

so, it noted that, previously, "[p]assword-protected files have been compared to a 'locked

footlocker inside the bedroom.'"  *Id.* at 718 (quoting *Trulock v. Freeh*, 275 F.3d 391, 403

(4th Cir. 2001)).[12]    Further, "[b]ecause intimate information is commonly stored on

computers it seems natural that computers should fall into the same category as suitcases,

footlockers, or other personal items that 'command[] a high degree of privacy.'" *Andrus*, 483

F.3d at 718 (second alteration in original) (quoting *United States v. Salinas-Cano*, 959 F.2d

861, 864 (10th Cir. 1992)).

¶88.    Given that "many [cell phones] are in fact minicomputers that also happen to have the

capacity to be used as a telephone," I equate passcode-protected cell phones to the desktop

computer in *Andrus*—and consequently to a locked footlocker—to determine what, if any,

expectation of privacy Knight had in his phone.  *Riley*, 573 U.S. at 393.  Of course, even

---

inquiry is unlawful unless authority actually exists.  But if so, the search is
valid.

*Id.* at 188-89 (second alteration in original) (citation omitted) (quoting *Terry v. Ohio*, 392
U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

[12] *See generally* **United States v. Chadwick**, 433 U.S. 1, 11, 97 S. Ct. 2476, 53 L. Ed.
2d 538 (1977) (holding "[b]y placing personal effects inside a double-locked footlocker,
respondents manifested an expectation that the contents would remain free from public
examination"), *overruled by* **California v. Acevedo**, 500 U.S. 565, 111 S. Ct. 1982, 114 L.
Ed. 2d 619 (1991).

though cell phones, like computers, contain an immense amount of private information, "the third-party consent exception to the warrant requirement applies to cell phones all the same, just like other essential 'effects' protected by the Fourth Amendment." ***United States v. Gardner***, 887 F.3d 780, 783-84 (6th Cir. 2018) (citing ***Matlock***, 415 U.S. at 171).

¶89.    When treating Knight's phone as a locked footlocker, a discrepancy arises between the phone and a traditional locked footlocker: Knight's phone was, for lack of a better phrase, a locked footlocker within a locked footlocker.  The phone, when powered on, presented Detective Ray with an initial passcode prompt, requiring entry of the passcode Knight gave Sarah.  This initial prompt represented the first lock, and the generally accessible contents of the phone behind it were the space inside the footlocker.  But once past the phone's first line of defense, Detective Ray needed a second passcode, one unknown to Sarah, to access Vaulty.  Thus, Vaulty and its contents, by virtue of Vaulty's separate lock/passcode, represented a second locked footlocker within the first.  My analysis accordingly must be two-fold, answering (1) whether Sarah possessed actual authority over Knight's phone generally and over Vaulty, and (2) whether Sarah possessed apparent authority over Knight's phone generally and over Vaulty.

¶90.    I first address whether Sarah possessed actual authority over Knight's phone generally.  The record presents two facts that are potential indicators of actual authority: (1) Sarah paid the bill for Knight's phone, and (2) Knight gave Sarah the passcode to unlock his

50

phone so she could use it to locate hers and to check Facebook. Relevant to the first fact, the United States Supreme Court clarified in *Matlock*:

> Common authority is . . . not to be implied *from the mere property interest a third party has in the property*, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7 (emphasis added) (citations omitted). Under *Matlock*, the question is not whether Sarah had a property interest in Knight's phone—which paying the bill constitutes—but whether she had "mutual use" and "joint access or control for most purposes[.]" *Id.*[13] I therefore would reject Sarah's paying the bill as an indicator of actual authority because Sarah's paying the bill did not grant her mutual use of or joint access to Knight's phone—Sarah had her own personal cell phone and had to obtain Knight's passcode to use his.

¶91. Regarding fact two—Knight's giving Sarah his phone's passcode—I would also reject it as an indicator of actual authority. To reiterate once more, "[a] third party has actual authority to consent to a search 'if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.'" *Andrus*, 483 F.3d at 716

---

[13] Landmark cases established the insufficiency of a mere property interest. *See generally **Chapman v. United States***, 365 U.S. 610, 616-17, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961) (holding a landlord's consent to search a tenant's rental home was insufficient to justify law enforcement's warrantless search of the home); ***Stoner v. California***, 376 U.S. 483, 489-90, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964) (holding a hotel employee could not consent to law enforcement's searching of a guest's room).

51

(quoting *Rith*, 164 F.3d at 1329). Although Sarah's knowing the passcode could support a finding of joint access under alternate circumstances, I would not hold that Sarah had joint access to Knight's phone and that Knight had forfeited any expectation of privacy in his phone simply because Sarah had obtained his passcode for a one-time use under false pretenses. Such a holding would set a dangerous precedent, authorizing a warrantless search of a cell phone any time the phone's user allows another to know his or her passcode, no matter how brief the period of access allowed.

¶92.   To underscore the lack of facts that support Sarah's possessing actual authority over Knight's phone generally, I briefly summarize a persuasive case in which a third party was found to possess actual authority over a defendant's cell phone: *United States v. Perry*, 92 F.4th 500 (4th Cir. 2024).[14]   There, Perry, who was detained pending trial, "often spoke to [his girlfriend] McCarr, who had his cell phone. He gave her the phone's passcode, and she used it for personal purposes and to communicate with Perry and his family." *Id.* at 507. McCarr eventually surrendered Perry's phone to law enforcement, "giving both it and the passcode to federal agents, along with her consent to search." *Id.* at 508.

¶93.   On appeal, Perry alleged that "McCarr had neither actual nor apparent authority to grant . . . consent" to search the phone and that "the police needed either *his* consent or a warrant" to do so. *Id.* at 512. The court disagreed, however, holding "that McCarr had

---

[14] Another example of a third party's actual authority over a defendant's cell phone is *Gardner*, 887 F.3d at 784.

actual authority to consent to the phone's search." *Id.* at 513. This holding was based on three dispositive facts: (1) "for the seven months leading up to her decision to give the phone to federal agents, McCarr was the only person to use the cell phone"; (2) McCarr "regularly used the phone for purely personal purposes"; and (3) McCarr "had access to the contents of the entire phone." *Id.* at 512-13. Together, these facts "show[ed] that McCarr had at least joint, if not sole, access and control over the cell phone at the time of the search." *Id.* at 512.

¶94. Returning to Knight's case, the facts are the inverse of those in *Perry*. Sarah (1) possessed her own phone that she used for personal purposes, (2) did not use Knight's phone for personal purposes, (3) had only known the phone's passcode for at most a few hours, and (4) did not have access to the entire phone. These deficiencies lead to only one conclusion: Sarah did not possess actual authority to consent to a search of Knight's phone generally.

¶95. As to whether Sarah had actual authority over Vaulty, the analysis is simpler. The record confirms (1) that Sarah did not know the passcode to unlock Vaulty and (2) that Sarah broke into Vaulty. Sarah therefore clearly did not have "mutual use of [Vaulty] by virtue of joint access . . . or control for most purposes." *Andrus*, 483 F.3d at 716 (internal quotation mark omitted) (quoting *Rith*, 164 F.3d at 1329). She instead had the opposite—she was prevented from using Vaulty via passcode protection. I would thus hold that Sarah did not have actual authority to grant Detective Ray consent to search Vaulty.

¶96. As to apparent authority, to determine whether Detective Ray could have reasonably believed, even erroneously, that Sarah possessed authority to consent to a search of Knight's

53

phone generally or of Vaulty, I conduct a "totality-of-the-circumstances analysis[.]" *Andrus*, 483 F.3d at 722. At the police department, Sarah apprised Detective Ray of multiple facts: (1) that she paid the bill for Knight's phone, (2) that she invented an excuse to obtain Knight's phone, (3) that Knight had given her his passcode for limited use, and (4) that she broke into Vaulty. Further, Detective Ray was aware that the phone was Knight's personal phone and that Sarah had her own phone. Considering the totality of these circumstances, I find that it was *impossible* for Detective Ray to form such a belief. Everything Sarah told Detective Ray, and everything about the situation, indicated to Detective Ray that Sarah was *not* the phone's or Vaulty's user. I would accordingly hold Sarah did not have apparent authority over Knight's phone generally or over Vaulty.

**CONCLUSION**

¶97. Justice William Brennan cautioned in 1984:

> While the machinery of law enforcement and indeed the nature of crime itself have changed dramatically since the Fourth Amendment became part of the Nation's fundamental law in 1791, what the Framers understood then remains true today—that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our commitment to protecting individual liberty and privacy.

*United States v. Leon*, 468 U.S. 897, 929-30, 104 S. Ct. 3430, 82 L. Ed. 2d 677 (1984) (Brennan, J., dissenting).

¶98. This Court is charged with no duty so sacred as ensuring that the people of Mississippi receive the protections they are promised by the Constitution. Heeding Justice Brennan's

54

warning, I do not sacrifice my duty for the sake of expediency.  Because the private-search doctrine does not apply and because Sarah could not grant third-party consent, Detective Ray—an agent of the government—infringed upon Knight's Fourth Amendment rights by unlocking and searching his cell phone without a warrant.  I would therefore suppress the evidence obtained from Knight's phone.  Further, I would reverse Knight's conviction and his sentence and remand this case to the circuit court for a new trial.

**SULLIVAN, J., JOINS THIS OPINION.**